## Case No. 14,275.

### TUTHILL v. BABCOCK et al.

[2 Woodb. & M. 298.] [1]

Circuit Court, D. Massachusetts.    Oct. Term, 1846.

EQUITY—FRAUD IN SALE—BILL TO RESCIND— COVENANT NOT TO SUE.

1. Besides the points settled in Smith v. Babcock [Case No. 13,009], the additional ones adjudged here were, that if a party himself, in the bill to rescind a contract for fraud in the sale, one ground of which is falsehood as to the quantity of timber on a township, makes an examination of the land before the purchase, but does not go into details, and confides for those in the false statements of the person negotiating with him, and of his agents, that party is not precluded from a rescinding of the sale for fraud, however he might be for a mistake.

[Cited in Converse v. Blumrich, 14 Mich. 123; Crislip v. Cain, 19 W. Va. 474.]

2. His right to rescind in such case strengthened, if there was falsehood as to other material matters in the trade, not offered to be examined; nor is he barred from his remedy against some of the men in interest, (who received his money and notes,) by an agreement in the nature of a covenant not to sue some, on certain conditions, which have been complied with.

[See Babcock v. Terry, Case No. 702.]

3. A covenant not to sue one joint obligor is no bar to a suit against other obligors.

This was a bill in equity, similar in character to that in favor of William Smith against the same defendants [S. Babcock and others], and was instituted to set aside a sale made to the plaintiff [N. Tuthill, Jr.], on the same occasion of two thirtieths of the same township. Before the pleadings, an arrangement was made, dismissing the bill as to all the respondents, except Cross and Noble. Their answers were much like the final answers put in by them to Smith's bill, and it was agreed that the evidence taken in that cause might be used in this. The case was argued at the present term, after the close of Smith's Case [Case No. 13,009], by the same counsel as in that, except Loring and Rogers.

WOODBURY, Circuit Justice. In this case I have come to the same conclusion in respect to Cross and Noble, as in the bill in favor of Smith against these defendants. There is no essential difference in the facts, or the law, except as connected with Tuthill's visiting the premises before the sale was completed, and the declarations he made there and after his return, and the information

1 [Reported by Charles L. Woodbury, Esq., and George Minot, Esq.]

which was there communicated to him. That Tuthill went there is certain, and that one of his objects was to examine, so as to form some judgment in respect to the quantity of timber, compared with the certificates, and Cross's representations and proposed guarantees, is also certain. But, at the same time, it appears that he had other objects, such as inspecting the records, and learning something of Cross's responsibility. It furthermore appears, that he was in the hands of Cross and his agents most of the time while in Maine, conveying letters from Chalmers, a concealed employee of Cross, while professing to be a mere associate with Tuthill in the purchase; was recommended by him to Cross's certificate-makers, who had been guilty of such gross exaggerations; and actually fell into the company and guidance of his pilot, who has since testified to a hundred millions less timber in fact than those that were before with him on the land certified to, and sixty millions less than he himself had once previously represented. Tuthill was conducted probably over such parts of the town as might be most likely to subserve the interest of those who had formerly hired the pilot, leaving the examination by Tuthill necessarily imperfect, in so short a time as two days, spent on so large a tract, and deceptive, as far as it went; doubtless, from much reliance being placed on what was stated to him by persons in Cross's interest, and acting with a view to sustain Cross. Again he placed himself in Cross's company and associations, on his return to Portland. Now, although here were some apparent means to detect the exaggerations as to the timber, yet almost all the fountains of inquiry were tainted. He was constantly liable to be misled, and manifestly did not make that full examination himself, and that uninfluenced one, on which his judgment must alone or principally have relied. His examination may have been some depended on, concerning the general appearance and actual existence of such a township, and some as to the title, and quantity of pine, but as to this last, not in full; and though it may have corrected his previous impressions concerning the quantity, so as with the increasing dullness of such lands in the market, he declined to give nine dollars an acre, and finally concluded the bargain at only six, yet it is obvious, that he had not ascertained the whole truth in respect to them, or he would not have given so much as six dollars. It is obvious, likewise, that he was not in a situation, with such advisers as Chalmers, and such guides as Russell, to ascertain all the truth as to the timber, without spending much more time; and that he was still likely, by their deceits, in connection with what was said by Cross, and others in his interest, and by their superior knowledge of the timber, to rely on them in part, and thus to over-estimate the amount. Cross is liable for assertions as to matters more within his knowledge, though Tuthill should

attempt to make some inquiries concerning the correctness of them. See Mason v. Crosby [Case No. 9,234]; Lord Kenyon in Pasley v. Freeman, 3 Durn. & E. [Term R.] 51; Bull. N. P. 31; Esp. N. P. 629; 2 Esp. 572; Risney v. Selby, 1 Salk. 211. But besides this, his means of correcting any opinion as to Cross's representations about the goodness of the stream in the winter and spring, or about his great wealth, were likely to be wholly frustrated among those who were so deeply in Cross's interests; and who, as to his riches, had, by artful rumors and newspaper publications, become so strongly impressed with their great amount. It seems that his high reputation for wealth was, at that time, still prevalent with most people, and his counsel do not date his actual insolvency till a year or more after; and Tuthill, becoming satisfied as to Cross's large property, would naturally forbear to make his examinations so full and critical, as if supposing Cross to be irresponsible, and instead of pushing his inquiries beyond general points, would be more likely to rely on Cross's warranties and guaranties. Nor had Tuthill then, or at any time before the trade, any means offered to detect other concealments of Cross, concerning what had transpired as to the Second Boston Company, or the employment of Chalmers, as Cross's agent. His suspicions on those subjects had not been excited, and, consequently, any impositions in respect to them were not likely to be examined, nor was any offer made to give to him the means of setting matters right concerning them. It seems to me then, however doubtful it may be, whether Tuthill could recover here, on the ground of a mere mistake in the quantity of timber, under the form of this bill, and under his means of judging as to the quantity, there can be little serious doubt of the justice as well as law of his having the contract set aside for the false representations practised, and the material concealments made; and most of which, in other matters than the timber, he had no particular means of detecting, and on which he, in common with the other purchasers, could not but strongly rely. See Warner v. Daniels [Case No. 17,181]; 1 Younge, 407; 3 Yerg. 178; 2 Term R. 429; Breese, 331; Litt. Sel. Cas. 218. The detail of all these will be seen in the Case of Smith, where treating of Cross's liability, and are as to Cross's wealth, his title to all the land, the character of the stream the year round, and the concealments as to the failure of the Second Boston Company, and Chalmers' agency for Cross. The rights of Tuthill then, in this case, are the same against Cross and Noble as were Smith's, and a decree will be entered in conformity to this.

Since the pleadings and evidence in this case have been closed and published, it is stated that the contract made by Miller, and some other of his associates, with the First Boston Company, and which is annexed to Miller's deposition, is considered by Cross as a release to them, and his counsel ask leave to plead it now, as operating like a release to Cross; and the counsel of the company urge leave to plead the same as a release in respect to them, in the other bill by Smith. On examining that agreement, it appears to be in form a mere covenant not to sue further a portion of the defendants, provided, on a special and new survey of the land, the quantity of timber should turn out to be less than seventy millions of good pine, and those defendants would surrender the notes on receiving a pro rata payment, according to the reduced quantity. This survey has been had, and those notes surrendered, and a discontinuance entered as to those defendants. Now it is a well settled principle, that a covenant not to sue one joint promisor or obligor is not a release even of that one, and cannot be so pleaded. See cases cited in Ferson v. Sanger [Case No. 4,752]. For otherwise it would defeat the very object of the parties in resorting to a covenant, rather than a release, which was not to sue one, but to continue to sue the rest. It would also defeat the justice of the case, where, as here, the consideration for the covenant emanated only from those to whom the covenant is given, and extended, as here, only to the amount of the claims against them or their pro rata share, instead of the claims against the others likewise, or the whole. But much more is the covenant not to be perverted here from its original design, and to be made broader or more comprehensive than was intended by the parties to it, or the reasons for it, because the liabilities here were for separate notes and portions of money, though all were united in one bill, as the notes grew out of one transaction or sale. There would, then, be no use in allowing a special plea of a release to be made after so long delay, when, if made, it would operate merely as a further delay, without the party making it being at all able, either in point of law or equity, to sustain it by the instrument to which he refers.